614 A.2d 663

COMMONWEALTH of Pennsylvania, Appellee,

v.

Lee BAKER, a/k/a Herbert Baker, Jr., Appellant.

Supreme Court of Pennsylvania.

Argued Jan. 22, 1990.

Decided June 17, 1992.

542

544

Richard H. Knox, Philadelphia, for appellant.

Gaele McLaughlin Barthold, Deputy Dist. Atty., Ronald Eisenberg, Chief, Appeals Div., Hugh Burns, Robert A. Graci, Chief Deputy Atty. Gen., for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA, PAPADAKOS and CAPPY, JJ.

## OPINION OF THE COURT

PAPADAKOS, Justice.

Appellant and two accomplices, Eric Joseph and Mark Mitchell, each nineteen years of age, robbed the Metro Oil Company in Philadelphia in February, 1984. On entering the company's premises, the armed actors seized two employees, Adrian Crosby and Thomas Dolan. Mark Mitchell alone was wearing a ski mask. Appellant and Joseph proceeded to a second floor room with Dolan in front of them at gunpoint in order to open a safe. The company's owner, William Gambrell, was sitting in his second-floor office where Appellant

fatally shot him twice. Unable to open the safe, the actors fled with weapons found on the premises and money taken from both witnesses. While the one bullet taken from the victim's body was identified as a .38 caliber, the actual weapon used in the crime was never recovered.

Adrian Crosby failed to pick out the Appellant from a photo array but was able to identify him at the preliminary hearing and at trial. Thomas Dolan was shown two photo arrays and selected Baker on the second try. He also picked out the Appellant at trial as the killer of William Gambrell. Other witnesses, Floyd Jenkins and Calvin Budden, identified Appellant and his accomplices from photographs as the persons whom they had seen enter the Metro Fuel Company.

Appellant, who did not testify at trial, originally denied any participation in the crime, insisting that he was repairing the property of Karen Hawkins. When confronted with the conflicting inculpatory statements of witnesses, however, he admitted his presence but stated, in writing to the police, that one of his co-defendants, Eric Joseph, had fired over his shoulder and killed the victim. Following an unsuccessful effort at suppression, a redacted transcription of Baker's statement, dated March 7, 1984, was read at trial. (T.T. September 28, 1984, pp. 4.59–4.70.)

The three co-defendants were tried together before the Honorable Albert F. Sabo and a jury from September 24, 1984, to October 4, 1984, when the jury returned its verdicts of guilt. A separate sentencing hearing was held and on October 5, 1984, the sentencing jury condemned Appellant to death and Joseph and Mitchell to life imprisonment for murder in the first degree. Appellant Baker also received consecutive sentences for conspiracy, robbery, and possessing instruments of crime.[1]

At the penalty hearing, the prosecution presented evidence of Appellant's juvenile adjudications which included one rob-

1. The convictions of Mitchell and Joseph were affirmed by the Superior Court. Joseph's petition for allocatur was denied by this Court on October 7, 1984.

bery, aggravated assault, and five burglaries. Appellant presented evidence of mitigation.[2]

While on direct appeal to this Court,[3] Appellant, who was represented by new counsel, filed a pro-se petition alleging ineffectiveness of trial counsel. We remanded for an evidentiary hearing in the form of a proceeding under the Post Conviction Hearing Act, 42 Pa.C.S. § 9541, et seq., and Judge Sabo, as indicated below, denied the petition for relief on November 18, 1987.

As in all death penalty cases, we have conducted an independent examination of the evidence to determine if it supports the verdict of guilt. *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983). Our test for determining the sufficiency of the evidence is to view the evidence in the light most favorable to the verdict winner, and thus, to determine whether the jury reasonably could have concluded that all elements of the crime were established beyond a reasonable doubt. *Commonwealth v. Syre*, 507 Pa. 299, 489 A.2d 1340 (1985).

Our review of the record, as noted herein, clearly established a sufficiency of evidence to support the verdict by the jury.

2. The jury found, as aggravating circumstances, that defendant committed the killing while in perpetration of a felony, 42 Pa.C.S. § 9711(d)(6); that defendant knowingly created a grave risk of death to other persons in addition to the victim, (d)(7); and that defendant had a significant history of felony convictions involving the use or threat of violence to the person, (d)(9). As mitigating circumstances, the jury specified subsection (e)(4), the age of the defendant at the time of the crime; and (e)(8), any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense.

Although the jury found three aggravating circumstances, the only issue before us concerns the legality of introducing evidence of juvenile adjudications to establish aggravating circumstance (d)(9). This issue is addressed at Part III of this opinion.

3. A direct appeal to this Court from the imposition of a penalty of death is authorized by 42 Pa.C.S. § 9711(h)(1) which provides:

(h) Review of death sentence.—

(1) A sentence of death shall be subject to automatic review by the Supreme Court of Pennsylvania pursuant to its rules.

Appellant raises the following allegations of error. We find those allegations to be without merit and affirm the judgment of sentence.

## I. Pre–Trial

### A. *Failure to Suppress Appellant's Pre–Trial Statement*

■ Appellant argues that the inculpatory statement which he gave to the police on March 7, 1984, should have been suppressed on the grounds that its credibility was tainted by his confusion at that moment and that it was the product of coercion. A transcript of the confession was read to the trial court. In his statement, Appellant pointed to an unspecified other "guy" as the killer: "As I got past him, I was looking inside and he put the gun over my shoulder and began firing." (T.T. September 28, 1984, p. 4.66.)

Appellant bases his suppression argument, first, on allegations that there were conflicts in his story. This is a matter of credibility which was fully explored in the jury's presence on cross-examination of the officer who took the statement. (T.T. September 28, 1984, pp. 4.73–4.91, 4.93–4.94.)

■ Regarding the challenge to the voluntariness of the confession, Appellant later denied having signed the document but stated that the police were going to "put it all on me" unless he signed. At trial, the police officer testified that Appellant carefully read all seven pages. (T.T. September 28, 1984, p. 4.71.) There is no dispute that it is Appellant's signature on the document. (Appellant's Brief, p. 44, acknowledges that he signed it but denies that it was done voluntarily and knowingly.) On these facts, and given the refusal of the Suppression Court to silence the statement, no hard evidence appears on the record to support Appellant's allegation of error. We find neither threats, promises, physical force, nor coercion in this record. Where a defendant is informed of his rights, and he understands them and still makes a .voluntary and knowing confession, the statement is admissible in a murder prosecution. *Commonwealth v. Franklin,* 438 Pa. 411, 265 A.2d 361 (1970).

## B. Suppression of the Identification Testimony of Witnesses Thomas Dolan and Adrian Crosby

### Thomas Dolan

Appellant advances two interwoven reasons in support of his contention that witness Dolan's in-trial court identification should not have been permitted. First, he argues that Dolan's photo identification was uncertain at best; and, second, he maintains that Dolan's ability to identify him at trial was aided immeasurably and improperly by contrived police action which lured him into the preliminary hearing room with Baker present, but without informing Baker's attorney that a line-up was underway.

Dolan was an employee of the Metro Fuel Company and was robbed by co-defendant, Mark Mitchell, during the crime taking place in the company's offices. Dolan also was taken upstairs by the assailants to the second floor office where the killing took place. Shortly afterwards, he was shown two photo arrays by the police. In the first array, Dolan selected a photo which was not Baker's. On the second display, however, he selected Baker and stated that the photograph looked like the shortest one of the three actors more so than the other pictures. Picking out Baker as the killer, Dolan then told the police, according to his testimony at the suppression hearing, that, "I said that's one that looks like him to me." (S.T., September 12, 1984, pp. 192–193).

Dolan also went to the subsequent preliminary hearing to give testimony. As the hearing was about to commence, two police officers told Dolan he could sit inside the courtroom, and there he saw Baker. As Dolan left the courtroom because he was not going to be called as a witness, a detective "asked me, the specific conversation, he asked me if I recognized anyone up there, pointing at no one." (S.T., September 12, 1984, p. 20). Dolan replied to the officer at that moment that the sight of Baker cleared his mind of any doubts regarding the prior identification of Baker. Dolan subsequently af-

firmed this at the suppression hearing where he was cross-examined as a prosecution witness by defense counsel for co-defendant, Mark Mitchell, and he testified as follows:

Q. You said that when you came to the preliminary hearing, you told Detective Nespoli that now it was clear?

A. Yes.

Q. What did you mean by that? You weren't sure who the person was, you were not sure of the photographs that you viewed?

A. Well, I said I had seen two separate photographs that resembled what I thought was Mr. Baker and because there was a doubt in my mind, which was at the point cleared up at the hearing.

Q. And .it wasn't until the preliminary hearing that your mind was cleared?

A. It made me at ease, yes.

At suppression, Appellant unsuccessfully sought to crush all of Dolan's identification testimony. Dolan persisted, however, in his recollection that he had selected Baker's photograph because, "I was able to see the person holding the gun." "Q. He is the one who fired the shot? A. Yes he was." (S.T., September 12, 1984, pp. 192, 194).[4]

As to the effects of encountering Baker at the preliminary hearing, Dolan told the police that seeing Baker had an effect on him: "it cleared up my mind." (S.T., September 12, 1984,

**4.** Additional testimony by Dolan at *id.* is as follows:
Q. What, if anything, did you say to the police when you saw the second group of photographs?
A. I then said that this person looks like the person who had pulled the trigger, more so than any of the first group of pictures.
According to Detective Francis Ansel, who conducted the photo array, Dolan stated:
A. He said, The only picture I recognize is this guy here, indicating Lee Baker, and he looks like the short guy, the one that did the shooting. His face and his build look like him. I can't tell his height by the picture.
Q. He said it looks like him; it looks like the short guy?
A. By face and build, but couldn't judge the height.

p. 195).[5]

At trial, Dolan once again pointed to Appellant as the killer:

Q. What did you see Mr. Baker do, if anything, as he took the half step forward?

A. I saw his hand come out with the gun that he had at my side and fire what I believe was two shots.

Q. What direction was the gun pointed when the two shots were fired?

A. It was pointed directly through the doorway where Mr. Gambrell was sitting.

Q. He was sitting at the desk; is that right?

A. Yes.

(T.T., September 25, 1984, p. 281).

Appellant now insists that the in-trial court identification was tainted by the preliminary hearing where, he concludes, an ex parte informal line-up took place in violation of his Sixth Amendment right to counsel at a critical stage of the proceedings against him. Moreover, Appellant further argues that the certainty of the suppression identification and in-trial court identification was possible only because the witness clarified his earlier photo perception of the killer through the bolstering mechanism of an illegal line-up.

■ We conclude at the outset of our analysis that Appellant's right of confrontation at the preliminary hearing was violated. In *Commonwealth v. Richman*, 458 Pa. 167, 320 A.2d 351 (1974), we held that due process requires an attorney's presence at a line-up, and where an identification took place at the preliminary hearing without the knowledge of the defendant's counsel, his rights were impaired. The "Richman Rule" also has been followed in *Commonwealth v. Ransome*, 485 Pa. 490, 402 A.2d 1379 (1979), and *Commonwealth v. Bogan*, 482 Pa. 151, 393 A.2d 424 (1978). In both cases, we determined that the remedy for the impropriety was suppression of the evidence. Since it was the defense rather than the

5. In response to Baker's testimony at suppression, Appellant's counsel moved for a line-up. The court denied the motion because the witness had seen pictures of Baker. (S.T., September 12, 1984, pp. 171–172).

prosecution, however, which then injected the identification into the trial evidence, we also decided that the defendants in those two cases could not complain of a constitutional transgression.

In the instant case, we take particular note of the fact that at trial the Commonwealth electively suppressed evidence of its witness' statement to the police after the preliminary hearing, the suppression identification, as well as the evidence of the photo array. That evidence was not used at trial; omission equals suppression.

 On this record, Appellant urges us to disqualify the in-trial court identification on the grounds that it was suggestively tainted by the impermissible line-up. The law of this Commonwealth, on the other hand, expresses our greatest concern that such identification evidence be based on its reliability. *Commonwealth v. Sexton,* 485 Pa. 17, 400 A.2d 1289 (1979), teaches that suggestiveness of confrontation is merely one factor in deciding the issue of reliability. Of course, suggestiveness arising from an illicit preliminary hearing line-up can be negated by a showing that the identification at trial had an independent basis. *Commonwealth v. Yarris,* 519 Pa. 571, 549 A.2d 513 (1988). The paramount aim of our law, nevertheless, is to judge the reliability of the identification. The relationship between suggestiveness and reliability was stated in *Ransome,* 485 Pa. at 496, 402 A.2d at 1382–83, following *Sexton:* "Even if we were to accept appellant's contention that this identification occurred in suggestive circumstances, we cannot accept his claim that the identification was unreliable."

██ In gauging reliability, we employ a totality of circumstances test. *Commonwealth v. Fowler,* 466 Pa. 198, 204, 352 A.2d 17, 20 (1976). Specific factors to be taken into account include the prior opportunity of the witness to observe the criminal act; the accuracy of photo array selection and other descriptions; the lapse of time between the act and any lineup; and any failure to identify the defendant on prior occasions. *Ransome,* 485 Pa. at 496, 402 A.2d at 1382; *Common-*

wealth v. Taylor, 472 Pa. 1, 370 A.2d 1197 (1977). Here we are faced with the task of balancing two circumstances. On one side exists the allegation of inseparable suggestiveness of confrontation and in-court identification. On the other stands the unequivocal trial testimony of Dolan and his photo identifications.

So viewed, the trial record establishes the fact that Dolan was the only witness before the jury who targeted Baker as the killer. To reiterate a crucial point, his testimony was not buttressed by any references to any prior identifications. The prosecution has a right to build its case at trial, and there Dolan's identification evidence stood alone but fully subject to the great truth-finding process of cross-examination. His unshakeable and uncontradicted testimony revealed that he had been threatened by Baker with a gun and had stood near Baker, whose face was uncovered, when the weapon was fired at the victim.

██ An opportunity to observe, even for a limited moment, can form an independent basis for an in-court identification, *Commonwealth v. Holland*, 480 Pa. 202, 389 A.2d 1026 (1978), while a prior photographic identification must be taken into account for the same purpose. *Taylor*, 472 Pa. at 21, 370 A.2d at 1207. Although Dolan's photographic selections resulted in one failure and one success, some weight must be accorded to his second identification.

██ In working through the legal calculus of the totality of circumstances test, therefore, we are compelled to conclude that the identification was reliable. The ability of the witness to observe in these circumstances then becomes a matter of credibility for the jury's determination. *Commonwealth v. Shoatz*, 469 Pa. 545, 366 A.2d 1216 (1976); *Commonwealth v. Kloiber*, 378 Pa. 412, 106 A.2d 820 (1954). That is to say that, following *Ransome*, even assuming arguendo that suggestiveness lingered on in Dolan's memory, there are sufficient factual circumstances to find that his identification was reliable.

■

*Adrian Crosby*

Witness Crosby was the victim's nephew and was working as a dispatcher at the Metro Fuel Company on the day of the crime. He saw Baker and a co-felon enter the premises, pull out guns, and force him to lie on the floor. Baker also took money from him. (T.T., September 25, 1984, pp. 2.16, 2.27–2.29). Soon after the shooting, he described his assailants to the victim's sons who, in response, stated that the description fit a person known as "Herbie" (Herbert Baker). Crosby was shown two sets of photographs but could not select Baker. (S.T., August 10, 1984, p. 38).

The evidence indicates further that prior to entering the preliminary hearing courtroom, a police officer told him that "the guys would be here," inferring the identity of the men sitting at the defense table. (N.T., March 29, 1984, pp. 6–7). Crosby testified at the preliminary hearing and pointed to Baker as one of the actors. (N.T., March 29, 1984, pp. 1–3).

At trial, Crosby repeated all of the above substantive information, except that once again no testimony regarding photographic identifications or statements made at any pre-trial hearings was brought in.[6] Additionally, he was thoroughly examined regarding his observations of the crimes, and the court gave a *Kloiber* instruction to the jury. (A *Kloiber* charge is given to caution a jury that identification evidence which is weak or equivocal should be received with caution. *Commonwealth v. Kloiber*, 378 Pa. 412, 106 A.2d 820 (1954)).

Repeating his allegation as to Dolan's testimony, Appellant argues that Crosby's in-trial court identification should have been suppressed because it, too, was the fruit of an improper preliminary hearing line-up. That line-up was allegedly tainted by two factors: first, the police engaged in an act of

6. Crosby's failure to identify Baker from the photo array was subsequently introduced at trial. During cross-examination, Baker's counsel sought to have Crosby testify to the array. Co-defendant Eric Joseph objected for fear that Crosby would blurt out that he did pick out Joseph. It was agreed by the parties to bring out this information during a later examination of a police officer, and this fact was established at that point as to Joseph only. (T.T., September 25, 1984, pp. 2.51–2.54; October 1, 1984, pp. 5.53–5.58.)

identifying the suspects for the witness before he entered the room; and, second, Crosby's identification of Baker at the preliminary hearing was the direct outcome of having had his memory colored by the suggestions made by the victim's sons.

These allegations likewise lack merit. The preliminary hearing was conducted with the full knowledge and participation of defense counsel. The potential suggestiveness made by the victim's sons was explored at trial. (T.T., September 25, 1984, pp. 2.40, 2.49). In any event, we find that the identification was reliable as per our analysis above.

## II. Trial

### A. The Trial Court's Restriction of Defendant's Trial

Appellant alleges in a generic sense that the court "restricted the trial by its rulings." Under this heading, he collects various allegations which are considered separately below.

### 1) The Court Refused to Charge The Jury to Consider the Evidence Separately as to Each Accused

The record shows, to the contrary, that Judge Sabo instructed the jury: "You will do that for each defendant separately. As I told you before, you consider the evidence against each one separately to make sure the Commonwealth has proven each [charge], whichever one you are deliberating on, if the evidence convinces you of that person's guilt beyond a reasonable doubt." (T.T., October 3, 1984, pp. 7.187–7.188). In addition, during the trial, the court told the jury that statements made by one accused could not be considered as evidence against the other. (T.T., September 26, 1984, pp. 3.28–3.29).

### 2) The Court Refused to Allow Proper Examination of a Police Witness

Appellant claims that he attempted to cross-examine Officer Donald Irons as to "descriptive information which he was told at the scene of the crime by witnesses," which was "highly relevant to the identity of the perpetrators and to the issue of identification." (Brief, pp. 48–49). He now alleges that the court sustained a Commonwealth objection to this cross-examination. The record shows that he asked no questions of Officer Irons at this point, but rather that his co-

defendants did. (T.T., September 24, 1984, p. 1.79). He cannot complain about sustained objections to cross-examination questions by the co-defendants. *Commonwealth v. Johnson*, 474 Pa. 410, 378 A.2d 859 (1977) (defendant may not assert personal rights of another). The supposed "identification information" raised by co-defendant Mitchell, pertained to information "about the height of the tallest person." These questions did not pertain to Appellant because he was the shortest of the defendants. The court did not preclude such questioning, but ruled that such cross-examination was beyond the scope of direct examination, and invited co-defendant Mitchell to call Officer Irons as his own witness, which he did on October 2, during the defense case, at which point the evidence defendant claims was excluded was examined in detail (T.T., October 2, 1984, pp. 6.75–.88). Appellant then asked only one question on cross-examination, eliciting a description consistent with his own height.

### 3) The Trial Court Sustained Objections to Examining Crosby's Photographic Selections

See footnote 6 herein. The claim lacks merit on the record.

### 4) Failure to Rule on an Objection

Appellant claims that during the cross-examination of witness Dolan, the court failed to rule on a Commonwealth objection to a question put to Dolan regarding the witness' characterization of the heights of the actors in comparison to his own height. Because of *Johnson*, we again fail to see Appellant's standing to raise a Commonwealth claim.

### 5) Admission of Evidence of Other Crimes

Appellant alleges that he was prejudiced by the admission of evidence of other crimes. A Commonwealth witness and friend of co-defendant Eric Joseph, Marcus Argro, was allowed to testify to the fact that several days after the killing of Gambrell, he met Joseph who had a gun which accidentally discharged and hit Argro in the leg. The bullet was recovered by the police, and a police expert then testified that the bullet came from the same *type* of weapon used to murder Gambrell. The Commonwealth's purpose was to show that Eric Joseph

had possession of a weapon similar to the one used to kill Gambrell. Once again we find that this testimony was directed solely at Eric Joseph, not Baker. Indeed, Baker's counsel did not cross-examine either witness since the evidence tended to lessen suspicion of Baker as the killer. (T.T., September 28, 1984, p. 4.53). Defense counsel, however, had objected earlier on the grounds that the evidence was irrelevant. (T.T., September 28, 1984, p. 4.132). The jury was instructed carefully that the shooting of Argro was not to be viewed as indicating that Joseph was a bad character. It had nothing to do with Appellant.

### 6) Admission of Hearsay Evidence

Appellant argues that the Commonwealth's evidence as to a police officer's efforts to locate a missing witness, Christopher Jews, was hearsay in that the detective testified that relatives and friends of Jews told the detective they did not know where Jews could be located. These statements were not offered for their truth, but to substantiate the detective's efforts to find the witness. They were not hearsay.

### 7) Examination of Other Witnesses

Appellant claims that it was error for the court to sustain a prosecutor's objection to cross-examination of witnesses by counsel for co-defendant, Mark Mitchell. Baker's own counsel did not examine these witnesses. (T.T., October 1, 1984, p. 5.35), and under *Johnson,* he has no standing to assert another party's claim.

### B. Prosecutorial Misconduct Closing Remarks [7]

Appellant asserts that the prosecutor engaged in improper summations to the guilt jury and, furthermore, that the remarks infected the penalty phase of the proceedings by producing a sanction derived from passion, prejudice, or arbitrariness. While his brief includes a lengthy excerpt of those

7. For unexplained reasons, this particular allegation is raised as part of Appellant's previous claim regarding juvenile records. Appellant appears to suggest that the prosecutor's emphasis on his juvenile record, allegedly inadmissible, was in itself part of an effort to inflame the jury.

remarks, he emphasizes the crucial importance of the following statements: the victim "lived the American dream" and the jury should "put [its] arms around the Gambrells and promise the individuals who did this will be held responsible;" "Mr. Gambrell cannot be brought back to his family;" the co-defendants "had voted on agreed unanimously. . . . that they voted he was to die and carried out the execution. . . . it is society's fault that (they) did it is an insult to myself, to Detective Nespoli, to Detective Graham, Sheriff Dade, all of us who grew up on the streets of Philadelphia;" and "what manner of man sits before you." (Brief, pp. 23–24.)

At the guilt phase, we long have held that statements to the jury are not improper unless their "unavoidable effect" is to "prejudice" the jury so that a true verdict cannot be rendered because the existence of bias and hostility makes it impossible to weigh the evidence in a neutral manner. *Commonwealth v. Carpenter,* 511 Pa. 429, 515 A.2d 531 (1986), and cases collected therein. Within these broad limitations, however, the prosecutor is free to argue that the evidence leads to guilt, and the Commonwealth can press its case with "logical force and vigor." *Commonwealth v. Cronin,* 464 Pa. 138, 346 A.2d 59 (1975), quoting ABA Standards. On the other hand, a prosecutor "may not indulge in personal assertions of guilt of a defendant either by direct statement or indirectly by figure of speech." *Cronin,* 464 Pa. at 143; 346 A.2d at 62.

At the penalty phase, however, where the presumption of innocence is no longer applicable, the prosecutor is entitled to "present argument for or against the sentence of death," 42 Pa.C.S. § 9711(a)(3), and may employ "oratorical license and impassioned argument," including a statement that Appellant "showed no sympathy or mercy to his victims." *Commonwealth v. Banks,* 513 Pa. 318, 521 A.2d 1 (1987), *cert. den.* 484 U.S. 873, 108 S.Ct. 211, 98 L.Ed.2d 162 (1987). Also, see the cases collected in *Commonwealth v. Whitney,* 511 Pa. 232, 512 A.2d 1152 (1986).

According to these standards, we find nothing improper about the prosecutor's guilt phase statements. On

the contrary, the Commonwealth's representative expressly told the jury that the case should not be decided "on an emotional level," (T.T. October 4, 1984, p. 8.100), while the court itself instructed the jury that closing remarks are not evidence in the case. (T.T. October 3, 1984, pp. 7.189–7.190.) The presumption in our law is that the jury has followed instructions. *Commonwealth v. Stoltzfus,* 462 Pa. 43, 55, 337 A.2d 873, 879 (1975). We conclude that the closing remarks were designed to allow the verdict to flow from the evidence within the bounds of proper argumentation. Even if any of the remarks are considered improper, a new trial is not required for every improper remark. *Commonwealth v. Perkins,* 473 Pa. 116, 373 A.2d 1076 (1977). Only where the unavoidable effect of the remark creates such a bias and hostility that the jury could not render a true verdict will reversal be mandated in this Commonwealth. *Stoltzfus,* 462 Pa. at 61, 337 A.2d at 882. That is not the case under review.

## C. Challenge to the PCHA Hearing

In a pro-se petition, dated June 26, 1985, Appellant alleged ineffective assistance of counsel under the Post Conviction Hearing Act. New counsel was appointed on February 16, 1986, and we remanded to the trial court to consider his claims. On November 18, 1987, Judge Sabo denied the petition for relief. Appellant now appeals that denial in a series of allegations which we reject as either unwarranted or unintelligible.

First, Petitioner alleges error because Judge Sabo "refused to recuse himself." There is no record of any such motion for recusal. Matters which are not of record cannot be considered on appeal. *Commonwealth v. Quinlan,* 488 Pa. 255, 258, 412 A.2d 494, 496 (1980); *Commonwealth v. Young,* 456 Pa. 102, 317 A.2d 258 (1974). The only reason advanced to support the notion that Judge Sabo should have recused is that the same judge presided over his jury trial. Our law under *Commonwealth v. Boyle,* 498 Pa. 486, 447 A.2d 250 (1982), does not disqualify a jurist who conducted the earlier proceedings in the same case.

Second, he alleges error due to the trial court's repeated refusals to appoint an investigator to find numerous witnesses. The claim is meritless.

At no time did Petitioner claim that he needed an investigator to find the witnesses, while in the crucial case of Karen Hawkins, defense counsel visited her home many times. Regarding the myriad other names included in the Appellant's allegation, we find no explanation as to their usefulness as witnesses. Such claims occur in a vacuum and must be rejected.

Appellant next complains that the hearing court did not permit relitigation of suppression issues, these issues had been litigated and, in any case, no related claims were made in the context of ineffectiveness in his petition.

Fourth, Appellant complains that the trial court refused to permit him to testify concerning the peremptory challenges of qualified black jurors. On the contrary, he was permitted to state his personal recollection that eight black jurors were stricken by the Commonwealth.

Fifth, Appellant alleges that the PCHA court would not permit him to testify about the recantation affidavit of witness, Calvin Budden. The denial was based on the fact that defendant had *already* testified as to the alleged recantation which occurred while both men were in prison during post-trial motions. The matter was previously litigated. At that post-trial hearing, Budden testified that the recantation had been coerced by Baker, was false, and that his trial testimony was truthful.

He also argues that at the PCHA hearing, he was not permitted to ask trial counsel one question as to whether he had made any decision regarding cross-examination of witnesses, Dolan and Crosby, on their appearances at the preliminary hearing. The court then offered to allow Appellant to call trial counsel as his own witness in order to ask him this specific question but Baker chose not to do so. Appellant now states that he wanted to ask questions regarding counsel's understanding of the witness' presence at the preliminary

hearing. He did not bring this to the attention of the PCHA court through offer of proof. Also, he fails to explain why he refused to call trial counsel as his own witness.

Seventh, Appellant also insists that the PCHA court unfairly prohibited testimony that co-defendant Eric Joseph allegedly had been shown a statement of the Appellant on March 6, 1984, prior to his arrest. Appellant appears to suggest that this would prove that his confession dated March of the same year was fabricated by the police. Trial counsel was examined on this point by the PCHA court and stated that his own investigation had failed to substantiate Appellant's views.

Appellant next complains that the hearing court halted the testimony of his brother Lawrence and refused to hear the testimony of his brother Eullies, both of whom were present but "could not" manage to return at a later date due to unexplained employment responsibilities.

Obviously, the Appellant was free to subpoena these witnesses, but declined to do so. In any case, the claim is cast now in vague terms purporting error by the PCHA court.

Ninth, Appellant claims that the PCHA court erred by closing the testimony before he could locate witnesses, including especially Karen Hawkins. As noted above, his counsel had located Hawkins and interviewed her, while Appellant offered no basis for calling the others.

Last, Appellant claims that he was denied compulsory process in producing witnesses. It appears from his ambiguous language that he views the alleged absence of compulsory process as the product of the hearing court's failure to afford him an investigator and closing the proceedings before certain witnesses were located. These allegations are patently without any substance as explained above.

### D. Allegations of Ineffective Assistance of Trial Counsel

Appellant raises various claims of ineffectiveness by his trial counsel. While most of these were considered and denied by the PCHA court, they will be reviewed again.

 We have decided that ineffective assistance of counsel requires proof that trial counsel missed or mishandled a claim of arguable merit; that there was no reasonable basis for counsel's action; and that this action caused such prejudice to the client that the reliability of the trial is called into question. *Commonwealth v. Pierce*, 515 Pa. 153, 527 A.2d 973 (1987). Generalized ineffectiveness claims raised in a vacuum must be rejected. *Commonwealth v. Pettus*, 492 Pa. 558, 424 A.2d 1332 (1981). It is the Appellant's burden to prove his allegations of ineffectiveness. Counsel is presumed effective. *Commonwealth v. Floyd*, 506 Pa. 85, 484 A.2d 365 (1984).

Appellant first argues that his counsel failed to cross-examine witnesses Dolan and Crosby on their presence at the preliminary hearing. This claim was not raised in the PCHA petition which alleged only that counsel failed to request a lineup. In any case, these claims have been addressed above.

Secondly, Appellant claims that trial counsel was ineffective for not requesting a lineup for Adrian Crosby prior to the preliminary hearing. As trial counsel explained at the PCHA hearing, Crosby had failed to make a photographic identification, and counsel believed he would also fail to identify defendant in person. Appellant has never attempted to prove that Crosby, who recognized him at the preliminary hearing, would have failed to recognize him in a lineup. Since such a lineup identification clearly would have hurt Appellant, trial counsel's strategy was sound.

Third, trial counsel was not ineffective for not requesting appointment of an investigator. Appellant has not met his burden of establishing what, if any, useful information an investigator would have found had one been retained, as explained above.

Appellant next alleges that trial counsel interviewed Hawkins and Young, both of whom Appellant claims could not be found for the PCHA hearing, only briefly and that they were not asked whether there were other persons who saw Appellant on the day of the killing. Because neither Hawkins nor Young could recall seeing the defendant on that date, they could not have identified other persons who had seen Baker.

Fifth, Appellant alleges that his counsel did not interview any of the witnesses prior to trial. There is no evidence of this failure from trial counsel's testimony or anywhere else in the record. Appellant singles out trial counsel's failure to interview Christopher and Annie Jews. Both individuals could not be located even by police. Counsel was not ineffective for failing to speak to unavailable witnesses. Also, Appellant faults trial counsel for allegedly not interviewing Richard Easterling, who was called to the stand and did testify for a co-defendant. There is no evidence to indicate what useful testimony would have been obtained had Easterling been interviewed. This conclusion also applies to his claim that prosecution witnesses were not interviewed.

Appellant claims that trial counsel advised him not to testify, whereas trial counsel testified that he discussed the matter with him and left the final decision up to his judgment. The PCHA court accepted trial counsel's testimony, and counsel cannot be found to be ineffective for Appellant's own decision.

Trial counsel, likewise, is also criticized for not calling co-defendant, Eric Joseph, during suppression to support his contention that his confession was fabricated. Co-defendant Joseph's testimony before trial could well have exposed him to questioning which, in turn, could have incriminated him. Nor does Appellant allege that Joseph would have been willing to waive his Fifth Amendment privilege to refuse to testify.

We also conclude that counsel was not ineffective for not raising meritless claims of prosecutorial misconduct as discussed above.

Next, Appellant argues that trial counsel failed to request a *Kloiber* charge as to Thomas Dolan. A *Kloiber* charge is given as to witnesses who previously have failed to make an identification. As noted earlier, the charge was given as to Adrian Crosby, who had failed to select Baker from a photo array, but Dolan consistently identified him. This claim is meritless.

Additionally, Appellant claims that his trial counsel did not raise a claim under *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct.

1712, 90 L.Ed.2d 69 (1986), which requires that a defendant first must prove that he is a member of a cognizable racial group and that the prosecutor has exercised peremptory challenges to remove from the venire members of his race. We point out that *Batson* was decided two years after the trial of this case.

Lastly, Appellant claims that trial counsel somehow was ineffective for spending his own money to fund a search for character witnesses for the penalty stage. Appellant seems to conclude that his counsel, therefore, was ill-prepared. Of course, some of these witnesses did testify to his good character, and we can find no sensible reason to fault counsel's actions.

### III. Penalty Phase

#### A. Admission of Juvenile Record

At the penalty stage, the Custodian of Juvenile records of the Family Court was permitted to read Appellant's record of juvenile adjudications for delinquent acts committed when he was not yet eighteen years of age. The juvenile adjudication record is as follows (T.T., October 4, 1985, pp. 8.30–8.31):

*January 1, 1978*

burglary, theft, receiving stolen property, criminal trespass, criminal mischief, and criminal conspiracy.

*January 27, 1978*

burglary, theft, receiving stolen property, criminal trespass, criminal mischief, and criminal conspiracy.

*September 10, 1978*

burglary, theft, receiving stolen property, criminal trespass, criminal conspiracy.

*April 27, 1979*

burglary, criminal trespass, attempted theft, criminal conspiracy.

 

*November 27, 1980*

burglary, theft, receiving stolen property, criminal trespass, criminal conspiracy.

*January 4, 1982*

robbery, theft, terroristic threats, aggravated and simple assault, recklessly endangering another person, possession of an instrument of crime, possession of a weapon, and criminal conspiracy.

Appellant complains on three grounds: 1) that a juvenile "adjudication," as defined by the Juvenile Act, 1976, P.L. 586, No. 142, Sec. 2, 42 Pa.C.S. § 6354, should not have been admitted into evidence because it does not constitute a "conviction" for purposes of capital sentencing; 2) that while robbery and aggravated assault are crimes of violence, burglary is not; and 3) that it was error to allow the reading to the jury of adjudications other than those for robbery and aggravated assault because those adjudications were not proven to have had the potential for violence or involved actual violence, so that the Commonwealth's evidence was nothing more than mere labels. In the alternative, Appellant asserts that if all the other acts, including especially the burglary, are abstracted from consideration, the remaining count of robbery and count of aggravated assault are insufficient for a finding of "significant history of prior criminal convictions" as an aggravating circumstance. We reject these contentions.

 Regarding his first argument that juvenile adjudications are not convictions for the specific purpose of finding an aggravating circumstance for sentencing, we find no basis of support in either statutory law or case law.

This Commonwealth established a separate court with exclusive jurisdiction over accused minors in 1933. Up to that time, youthful offenders were tried equally with adults in the Quarter Sessions Courts. Act of June 2, 1933, P.L.1933, 11 P.S. § 261. Section 19 provided:

No order made by any juvenile court shall operate to impose any of the civil disabilities ordinarily imposed by the

criminal laws of the Commonwealth, nor shall any child be deemed to be a criminal by reason of any such order or be deemed to have been convicted of crime. The disposition of a child or any evidence given in a juvenile court shall not be admissible as evidence against the child in any case or proceeding in any other court. (Footnote omitted).

The contemporary counterpart appears in 42 Pa.C.S. 6354: [8]

**Section 6354. Effect of adjudication**

**(a) General Rule.**—An order of disposition or other adjudication in a proceeding under this chapter is not a conviction of crime and does not impose any civil disability ordinarily resulting from a conviction or operate to disqualify the child in any civil service application or appointment.

**(b) Effect in subsequent judicial matters.**—The disposition of a child under this chapter may not be used against him in any proceeding in any court other than a subsequent juvenile hearing, whether before or after reaching majority, except:

(1) in dispositional proceedings after conviction of a felony for the purposes of a presentence investigation and report.

Both this Court and the Superior Court found occasion to rule on the issue of whether a record of delinquency could be employed for the determination of sentence of an adult criminal under the Act of 1933, and in each instance of review, these tribunals determined that the juvenile acts indeed were admissible for that purpose. Our seminal case on point is *Commonwealth ex rel. Hendrikson v. Myers*, 393 Pa. 224, 144 A.2d 367 (1958), where the majority held (Justice Musmanno dissenting on the grounds that the juvenile record was unclear), specifically addressing Section 19, that while the delinquent record could not be used as "evidence ... in another court," to "deprive the Courts of the right to be informed of and to consider the history and background of the person subject to sentence may result in sentences which are unjust and unfair to both society and defendants." *Myers*, 393 Pa. at

---

**8.** Subsection (a), differentiating juvenile proceedings from criminal proceedings, continues the policy first established in 1893 and continued in Section 19 of the Act of 1933.

231, 144 A.2d at 371 (affirming the Superior Court's holding that the "judge was entitled to all of the material facts to inform him as to what kind of offender he was dealing with to assist him in determining the appropriate penalty." 182 Pa.Superior Ct. 169, 173–174, 126 A.2d 485, 486–487 [1956] ). The Superior Court in *Myers,* in fact, baldly concluded that the statute was not applicable to prevent the sentencing judge from considering the defendant's juvenile court record. 182 Pa.Superior Ct. at 174, 126 A.2d at 487.

The rationale behind both decisions in *Myers* derived from our previous ruling in *Commonwealth v. Petrillo,* 340 Pa. 33, 16 A.2d 50 (1940), where we settled on the broader principle that sentencing judges have wide latitude in considering facts, "regardless of whether such facts are produced by witnesses whom the court sees and hears." *Petrillo* was a death case. *Petrillo's* principle was applied in the same manner in *Commonwealth v. Johnson,* 348 Pa. 349, 354, 35 A.2d 312, 314 (1944). Moreover, the Superior Court applied *Petrillo* to the 1933 Act and approved the use of juvenile records as sentencing considerations. See, *Commonwealth ex rel. Miller v. Maroney,* 179 Pa.Superior Ct. 305, 116 A.2d 755 (1955); *Commonwealth ex rel. Yeschenko v. Keenan,* 179 Pa.Superior Ct. 145, 115 A.2d 386 (1955); and *Commonwealth ex rel. Czarnecki v. Stitzel,* 179 Pa.Superior Ct. 80, 115 A.2d 805 (1955).

More recent decisions by the Superior Court have affirmed uniformly this rule. *Commonwealth v. Woodward,* 368 Pa.Superior Ct. 363, 534 A.2d 478 (1987); allocatur denied, 520 Pa. 575, 549 A.2d 135 (1988); *Commonwealth v. Krum,* 367 Pa.Superior Ct. 511, 533 A.2d 134 (1987); *Commonwealth v. Morio,* 302 Pa.Superior Ct. 407, 448 A.2d 1106 (1982); and *Commonwealth v. Allen,* 287 Pa.Superior Ct. 88, 429 A.2d 1113 (1981) (citing *Myers* ).

While further analysis of this issue may appear to be superfluous in light of this well-settled authority, we take the opportunity to draw further attention to the fact that Pennsylvania adheres to a system of individualized sentencing which must explore the defendant's prior behavior and dangerousness before sanctions are imposed. For the care of capital

sentencing, indeed, is "a function of character analysis ... and the central idea of the present sentencing statute is to allow a jury to take into account such relevant information, bearing on a defendant's character and record, as is applicable to the task of considering the enumerated aggravating circumstances." *Commonwealth v. Beasley*, 505 Pa. 279, 479 A.2d 460 (1984) (citation omitted). Such contemporary language reflects the earlier rationale of *Petrillo* and *Myers*. In testing Appellant's allegations against our continuing rule on this issue, therefore, we find no merit whatsoever to his assertion.

 Appellant's claim that burglary is not a crime of violence runs directly counter to our decision in *Commonwealth v. Rolan*, 520 Pa. 1, 549 A.2d 553 (1988), where we determined that for purposes of finding an aggravating circumstance "the crime of burglary has always been and continues to be viewed as a crime involving the use or threat of violence to the person."

 His last allegation, *i.e.*, that it was error to disclose to the jury that Appellant had juvenile adjudications not proven to have had potential for violence or the use of actual violence, was put to rest by *Commonwealth v. Thomas*, 522 Pa. 256, 561 A.2d 699 (1989). Here each of the crimes read into the record was part of a burglary or robbery. The crimes arose out of the same acts as those utilized to establish an aggravating circumstance, thereby meeting fully the mandate of *Thomas:* "Evidence of this crime [indecent assault] was admissible because there was a logical connection between the crimes and because they arose out of the same criminal episode." *Thomas, supra*, at 276, 561 A.2d at 708; also, see, *Commonwealth v. Steele*, 522 Pa. 61, 559 A.2d 904 (1989).

## IV. Constitutionality of His Death Sentence

Appellant contends that the sentence is constitutionally defective on three grounds.

First, he argues that the sentencing court failed to define adequately the burden of proof as to mitigation. On this point, the court stated:

The Commonwealth has the burden of proving aggravating circumstances beyond a reasonable doubt. The defendant has the burden of proving mitigating circumstances, but only by a preponderance of the evidence. This is a lesser burden of proof than beyond a reasonable doubt. A preponderance of the evidence exists where one side is more believable than the other side. I have already defined for you in the case in chief what is a reasonable doubt.

(T.T., October 4, 1984, p. 8.110).

We find nothing defective in this language. We also reject his attached allegation that the court failed to define reasonable doubt, which it did on two occasions as the judge noted.

Second, Appellant refers to statutory language used in the charge that the verdict must be death if there is at least one aggravating circumstance and no mitigating circumstances, or if the aggravating circumstances outweigh the mitigating circumstances, and that the verdict must be life in all other cases. (T.T., October 4, 1984, p. 8.111). 42 Pa.C.S. § 9711(c)(1)(iv). He complains that the court "did not instruct the jury that if the mitigating circumstances outweigh the aggravating circumstances, that the verdict must be life imprisonment." (Brief, p. 74). A charge to this effect was unnecessary. The court's charge correctly stated the two instances in which death was required, and charged that in "all other cases," the verdict must be life imprisonment. Obviously, mitigation outweighing aggravation falls within the ambit of "all other cases." The court's charge followed the statute, which decides a "tie," and equal balance of aggravation and mitigation, in favor of the defense. It is also incorrect to conclude that the charge did not adequately and fully explain the manner by which the jury was to make its determination. *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983), *reh'g. denied*, 463 U.S. 1236, 104 S.Ct. 31, 77 L.Ed.2d 1452 (1983).

The next contention is that he was chosen for death arbitrarily since his two accomplices were not so sentenced. Ap-

pellant personally murdered the victim and his punishment was not arbitrary.

■ Finally, under our statutory duty to review death cases to determine whether the imposed sentence of death is "excessive or disproportionate to the penalty imposed in similar cases," according to 42 Pa.C.S. § 9711(h)(3)(iii), we have conducted an evaluation of all convictions of murder of the first degree prosecuted under the Act of September 13, 1978, P.L. 756, No. 141, 42 Pa.C.S. § 9711. We have reviewed the data and information pertaining to similar cases that have been compiled by the Administrative Office of Pennsylvania Courts (AOPC) pursuant to this Court's directive as enumerated in *Commonwealth v. Frey*, 504 Pa. 428, 475 A.2d 700 (1984). We find that the sentence of death is not excessive or disproportionate to the penalty imposed in similar cases, 42 Pa.C.S. § 9711(h)(3)(iii), and that the sentence was not the product of passion, prejudice or any other arbitrary factor, 42 Pa.C.S. § 9711(h)(3)(i).

For the foregoing reasons, we sustain the convictions and affirm the judgment of sentence based on the conviction for murder of the first degree and the sentence of imprisonment imposed for the conviction of possession of an instrument of crime.[9]

NIX, C.J., files a concurring and dissenting opinion joined by ZAPPALA and CAPPY, JJ.

CAPPY, J., files a concurring and dissenting opinion joined by ZAPPALA, J.

NIX, Chief Justice, concurring and dissenting.

I continue to possess the view that juvenile adjudications should not be used for establishing aggravating circumstances to justify the death sentence. I therefore dissent from the majority opinion that a history of juvenile adjudications may be used as an aggravating circumstance under the Death

9. The Prothonotary of the Supreme Court is directed to transmit the full and complete record of the trial, sentencing hearing, imposition of sentence, and review by this Court to the Governor. 42 Pa.C.S. § 9711(i).

Penalty Statute. I concur, however, in the Court's affirmance of a finding of murder in the first degree.

Juvenile adjudications do not operate within the same constitutional bounds as criminal proceedings at the adult level. There is no right to a jury trial in juvenile proceedings. *In re Terry*, 438 Pa. 339, 265 A.2d 350 (1970), *aff'd sub nom. McKeiver v. Pennsylvania*, 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971). *See Commonwealth v. Mitchell*, 283 Pa.Super. 455, 424 A.2d 897, *cert. denied*, 454 U.S. 851, 102 S.Ct. 292, 70 L.Ed.2d 141 (1981). A finding of delinquency does not connote the punitive concern that is connected with a conviction of a criminal offense. *In Interest of Spouse*, 381 Pa.Super. 166, 172, 553 A.2d 87, 90, ("The purpose of juvenile proceedings is to seek treatment and rehabilitation of the juvenile; it is not to punish") *appeal denied*, 523 Pa. 643, 563 A.2d 1167, 1168 (1989); *In Interest of Leonardo*, 291 Pa.Super. 644, 648, 436 A.2d 685, 687 (1981) ("Clearly juvenile proceedings are different in character and purpose from adult proceeding.... The purpose of juvenile proceeding is to seek treatment, reformation and rehabilitation, and not to punish.")

The concern in delinquency proceedings remains the well-being of the minor. When "the court finds that the child is not in need of treatment, supervision or rehabilitation, it shall dismiss the proceeding and discharge the child from any detention or other restriction theretofore ordered." 42 Pa. C.S. § 6341(b). *See, Interest of Dreslinski*, 254 Pa.Super. 539, 386 A.2d 81 (1978) (despite finding of delinquency trial court found no need for treatment; dismissed action).[1]

The Juvenile Act specifically purports to "remove from children committing delinquent acts the consequences of criminal behavior." 42 Pa.C.S. § 6301(b)(4) ("Short title and pur-

---

1. In adult criminal proceedings, the court places greater emphasis on society's needs rather than on the convicted criminal's needs. In criminal cases, "the court shall follow the general principle that the sentence imposed should call for confinement that is *consistent with the protection of the public*, the gravity of the offense as it relates to the *impact on the life of the victim* and on *the community*, and the rehabilitative needs of the defendant." 42 Pa.C.S. § 9721(b) ("Sentencing Generally; general standards") (emphasis added).

poses of Chapter"). The focus of the Juvenile Act is to rehabilitate and treat juvenile offenders. If the juvenile court finds that a juvenile offender belongs in adult criminal proceedings, then the juvenile court has the discretion to transfer that case to criminal court. 42 Pa.C.S. § 6355 ("Transfer to criminal proceedings"). If the child is fourteen years of age or older, not amenable to treatment under the juvenile system, and the charge could carry imprisonment of three years or more, *inter alia*, then the child may be transferred to criminal court and tried as an adult. *Id.* Convictions under these circumstances may be admissible as part of a "significant history of felony convictions" under the aggravating circumstances subsection of the Death Penalty Statute. 42 Pa.C.S. § 9711(d)(9). However, in this case, the appellant's juvenile adjudications of delinquency should not have been treated as convictions constituting a "significant history of felony convictions...." 42 Pa.C.S. § 9711(d)(9).

Section 6354 of the Juvenile Act says in no uncertain terms that an adjudication is not a conviction. 42 Pa.C.S. § 6354.[2] Subsection (b) allows the disposition to be used against a defendant after reaching majority when it is for the purposes of a presentence investigation or report; it does not change the classification of the disposition to a conviction. 42 Pa.C.S. § 6354(b).

The death penalty statute provides much less discretion to the sentencing body than the sentencing guidelines for non-

**2.** The statute provides:

§ 6354. **Effect of adjudication**

(a) General rule.—An order of disposition or other adjudication in a proceeding under this chapter *is not a conviction of crime* and *does not impose* any civil disability *ordinarily resulting from a conviction* or operate to disqualify the child in any civil service application or appointment.

(b) Effect in subsequent judicial matters.—The disposition of a child under this chapter may not be used against him in any proceeding in court other than at a subsequent juvenile hearing whether before or after reaching majority, except:

(1) in dispositional proceedings after conviction of a felony for the purposes of a presentence investigation and report; or

(2) if relevant, where he has put his reputation or character in issue in a civil matter.

42 Pa.C.S. § 6354 (emphasis added).

capital offenses. In the sentencing guidelines for non-capital offenses the Pennsylvania Legislature included a catchall provision in its list of aggravating circumstances for the court to consider when imposing a sentence upon a convicted defendant. 204 Pa.Code § 303.3(b)(6).[3] Conversely, the Death Penalty Statute, 42 Pa.C.S. § 9711, enumerates sixteen specific aggravating circumstances to be weighed by the jury when deliberating the sentence of death.[4] The phase "shall be

**3.** Section 303.3(b)(6) provides:
(6) "any other factors which in the court's opinion, warrant a sentence in the aggravating range."

**4.** The statute provides that:
(d) **Aggravating circumstances**—Aggravating circumstances *shall be limited* to the following:
(1) The victim was a fireman, peace officer or public servant concerned in official detention, as defined in 18 Pa.C.S. § 5121 (relating to escape), who was killed in the performance of his duties.
(2) The defendant paid or was paid by another person or had contracted to pay or be paid by another person or had conspired to pay or be paid by another person for the killing of the victim.
(3) The victim was being held by the defendant for ransom or reward, or as a shield or hostage.
(4) The death of the victim occurred while defendant was engaged in the hijacking of an aircraft.
(5) The victim was a prosecution witness to a murder or other felony committed by the defendant and was killed for the purpose of preventing his testimony against the defendant in any grand jury or criminal proceeding involving such offenses.
(6) The defendant committed a killing while in the perpetration of a felony.
(7) In the commission of the offense the defendant knowingly created a grave risk of death to another person in addition to the victim of the offense.
(8) The offense was committed by means of torture.
(9) The defendant has a significant history of felony convictions involving the use or threat of violence to the person.
(10) The defendant has been convicted of another Federal or State offense, committed either before or at the time of the offense at issue for which a sentence of life imprisonment or death was imposable or the defendant was undergoing a sentence of life imprisonment for any reason at the time of the commission of the offense.
(11) The defendant has been convicted of another murder, committed either before or at the time of the offense at issue.
(12) The defendant has been convicted of voluntary manslaughter, as defined in 18 Pa.C.S. § 2503 (relating to voluntary manslaughter), committed either before or at the time of the offense at issue.
(13) The defendant committed the killing or was an accomplice in the killing, as defined in 18 Pa.C.S. § 306(c) (relating to liability for

limited" in subsection (d) reflects legislative intent to limit aggravating circumstance to the sixteen explicitly enumerated circumstances and to forbid the jury from considering any additional aggravating circumstances. *Id.* Subsection (e) of the Death Penalty Statute (governing the use of mitigating circumstances) uses the language "shall include the following" and allows "[a]ny other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense." 42 Pa.C.S. § 9711(e).[5] Because subsection (e)

conduct of another; complicity), while in the perpetration of a felony under the provisions of the act of April 14, 1972 (P.L. 233, No. 64), known as The Controlled Substance, Drug, Device and Cosmetic Act, and punishable under the provisions of 18 Pa.C.S. § 7508 (relating to drug trafficking sentencing and penalties).

(14) At the time of the killing, the victim was or had been involved, associated or in competition with the defendant in the sale, manufacture, distribution or delivery of any controlled substance or counterfeit controlled substance in violation of The Controlled Substance, Drug, Device and Cosmetic Act or similar law of any other state, the District of Columbia or the United States, and the defendant committed the killing or was an accomplice to the killing as defined in 18 Pa.C.S. § 306(c), and the killing resulted from or was related to that association, involvement or competition to promote the defendant's activities in selling, manufacturing, distributing or delivering controlled substances or counterfeit controlled substances.

(15) At the time of the killing, the victim was or had been a nongovernmental informant or had otherwise provided any investigative, law enforcement or police agency with information concerning criminal activity and the defendant committed the killing or was an accomplice to the killing as defined in 18 Pa.C.S. § 306(c), and the killing was in retaliation for the victim's activities as a nongovernmental informant or in providing information concerning criminal activity to an investigative, law enforcement or police agency.

(16) The victim was a child under 12 years of age.
42 Pa.C.S. § 9711(d) (emphasis added).

5. **(e) Mitigating circumstances.**—Mitigating circumstances *shall include the following:*

(1) The defendant has no significant history of prior criminal convictions.

(2) The defendant was under the influence of extreme mental or emotional disturbance.

(3) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.

(4) The age of the defendant at the time of the crime.

(5) The defendant acted under extreme duress, although not such duress as to constitute a defense to prosecution under 18 Pa.C.S.

includes a catchall provision and subsection (d) does not, it is clear that the Legislature intended to limit strictly the aggravating circumstances.

Additionally, The Death Penalty Statute provides that the *jury* and not the court must determine the sentence; first degree murder is the only crime for which the General Assembly has allowed the jury to impose a sentence. Once a jury convicts a defendant of first degree murder, "the jury shall determine whether the defendant shall be sentenced to death or to life imprisonment." 42 Pa.C.S. § 9711(a)(1). "Evidence may be presented as to any matter that the court deems relevant *and admissible* on the question of the sentence to be imposed [but] ... [e]vidence of aggravated circumstances *shall be limited to those circumstances specified in subsection (d)."* 42 Pa.C.S. § 9711(a)(2) (emphasis added). This language is contrary to the Sentencing Code for non-capital offenses that allows the court to consider "any other factors which in the court's opinion warrant a sentence in the aggravating range", 204 Pa.Code § 303.3(b)(6). *See, supra,* note 3.

Having examined the texts of the appropriate statutes, we must now examine our caselaw to seek any authority for the use of juvenile adjudications to establish a "significant history of felony convictions." The majority relies on the following cases to support its proposition that adjudications of delinquency may be aggravating circumstances to be weighed by the jury when deliberating a sentence of death: *Commonwealth ex rel. Hendrickson v. Myers,* 393 Pa. 224, 144 A.2d 367 (1958); *Commonwealth v. Petrillo,* 340 Pa. 33, 16 A.2d 50 (1940); *Commonwealth v. Johnson,* 348 Pa. 349, 35 A.2d 312 (1944); *Commonwealth ex rel. Miller v. Maroney,* 179 Pa.Super. 305, 116 A.2d 755 (1955); *Commonwealth ex rel. Yeschen-*

§ 309 (relating to duress), or acted under the substantial domination of another person.

(6) The victim was a participant in the defendant's homicidal conduct or consented to the homicidal acts.

(7) The defendant's participation in the homicidal act was relatively minor.

(8) *Any other evidence of mitigation* concerning the character and record of the defendant and the circumstance of his offense.

*Id.* (emphasis added).

*ko v. Kennan,* 179 Pa.Super. 145, 115 A.2d 386 (1955); *Commonwealth ex rel. Czarnecki v. Stitzel,* 179 Pa.Super. 80, 115 A.2d 805 (1955); *Commonwealth v. Woodward,* 368 Pa.Super. 363, 534 A.2d 478 (1987) *appeal denied,* 520 Pa. 575, 549 A.2d 135 (1988); *Commonwealth v. Krum,* 367 Pa.Super. 511, 533 A.2d 134 (1987); *Commonwealth v. Morio,* 302 Pa.Super. 407, 448 A.2d 1106 (1982); *Commonwealth v. Allen,* 287 Pa.Super. 88, 429 A.2d 1113 (1981). The cases cited do not support that conclusion.

In *Commonwealth ex rel. Hendrickson v. Myers,* the defendant was found guilty of burglary, larceny, receiving stolen goods, and prison breach. *Id.* 393 Pa. at 226, 144 A.2d at 369. There was no charge of murder. Therefore, less restrictive sentencing guidelines applied, and the judge, not the jury, imposed the sentence. *Id.* In *Commonwealth v. Petrillo,* 340 Pa. 33, 16 A.2d 50 (1940), the defendant pleaded guilty to first degree murder and a panel of judges sentenced him to death. *Id.* 340 Pa. at 36–37, 16 A.2d at 53. The only common fact between the case at bar and *Petrillo* is that there was a sentence of death. However, it was imposed under the 1939 Crimes Code, the jury did not determine the sentence, and there was no mention of any juvenile proceedings. In *Commonwealth v. Johnson,* 348 Pa. 349, 35 A.2d 312 (1944), the Supreme Court of Pennsylvania *reversed* a death penalty sentence because the judges had heard *ex parte* information about the defendant relevant to the defendant's sentencing. The Court recognized the defendant's absolute right to be present for the presentation of any evidence at the sentencing stage of the proceeding. *Id.* 348 Pa. at 353, 35 A.2d at 314–15. The Supreme Court did not refer to juvenile adjudications.

In *Commonwealth ex rel. Miller v. Maroney,* 179 Pa.Super. 305, 116 A.2d 755 (1955), the defendant himself testified about his juvenile adjudication relating to his sentencing for non-capital offenses. Furthermore, the Superior Court never mentioned the *Petrillo* case nor did it review the use of juvenile adjudications in sentencing.

In *Commonwealth ex rel. Yeschenko v. Keenan,* 179 Pa.Super. 145, 115 A.2d 386 (1955), the Superior Court affirmed the

dismissal of the defendant's writs of error *coram vobis* and *habeas corpus.* The court held that prior criminal records were properly considered by the judge in sentencing the defendant for robbery, aggravated assault and battery, and pointing firearms. The *Keenan* case is inapplicable, however, because the offenses in *Keenan* were not punishable by death; thus juvenile records, which were not offered in that case, would have been admissible. *Id.*

In *Commonwealth ex rel. Czarnecki v. Stitzel,* 179 Pa.Super. 80, 115 A.2d 805 (1955), the Superior Court considered the juvenile's admission of committing forty-one burglaries as a juvenile when reviewing a sentence of five to twenty years for burglary, larceny, and receiving stolen goods. The Superior Court upheld the Court of Common Pleas' dismissal of the defendant's writ of habeas corpus. *Id.* 179 Pa.Super. at 83, 115 A.2d at 806. Again, this was a non-capital case.

*Commonwealth v. Woodward,* 368 Pa.Super. 363, 534 A.2d 478 (1987), addressed the use of juvenile adjudications as aggravating circumstances to be considered where the trial judge sentenced the defendant for forgery and theft by deception. The Superior Court relied upon *Commonwealth v. Krum,* 367 Pa.Super. 511, 533 A.2d 134 (1981), for its holding. *Woodward,* 368 Pa.Super. at 366–67, 534 A.2d at 480. In *Krum,* the Superior Court upheld the trial court's consideration of juvenile adjudications when imposing a sentence of four to eight years for burglary. *Krum,* 367 Pa.Super. at 521, 533 A.2d at 139.

In *Commonwealth v. Morio,* 302 Pa.Super. 407, 448 A.2d 1106 (1982), the Superior Court upheld the use of juvenile records in sentencing defendant to the maximum allowable sentence. In this case, the crimes were civil assault, escape, and criminal conspiracy, which are not covered by the sentencing provisions at issue in this case. *See id.* Additionally, *Commonwealth v. Allen,* 287 Pa.Super. 88, 429 A.2d 1113 (1981), also involves a non-capital case and the use of juvenile adjudication as factors for sentencing.

In summary, there is nothing in our caselaw or in the texts of the Juvenile Act or the Death Penalty Statute to support

the majority's opinion that juvenile adjudications may be considered as aggravating circumstances in the determination of the death sentence under our present statute.

Nor can we consider this harmless error. It is not possible to determine how much weight the jury placed on the juvenile adjudications when finding that there was "a significant history of felony convictions." 42 Pa.C.S. § 9711(d)(9). However, because the jury considered the juvenile adjudications improperly, then we must reverse the finding of that specific aggravating circumstance. Accordingly, pursuant to the review portion of the Death Penalty Statute,[6] we should remand this case for a redetermination of the appropriate sentence for the defendant.

ZAPPALA and CAPPY, JJ., join in this concurring and dissenting opinion.

6. The statute provides:
(h) Review of death sentence.—
(1) A sentence of death shall be subject to automatic review by the Supreme Court of Pennsylvania pursuant to its rules.
(2) In addition to its authority to correct errors at trial, the Supreme Court shall either affirm the sentence of death or vacate the sentence of death and remand for further proceedings as provided in paragraph (4).
(3) The Supreme Court shall affirm the sentence of death unless it determines that:
(i) the sentence of death was the product of passion, prejudice or any other arbitrary factor;
(ii) the evidence fails to support the finding of at least one aggravating circumstance specified in subsection (e); or
(iii) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant.
(4) If the Supreme Court determines that the death penalty must be vacated because none of the aggravating circumstances are supported by sufficient evidence or because the sentence of death is disproportionate to the penalty imposed in similar cases, then it shall remand for the imposition of a life imprisonment sentence. If the Supreme Court determines that the death penalty must be vacated for any other reason, it shall remand for a new sentencing hearing pursuant to subsections (a) through (g).
42 Pa.C.S. § 9711(h).
Because the introduction of the defendant's juvenile adjudications was prejudicial, under paragraph 3(i), we should remand the case for resentencing under paragraph (4).

CAPPY, Justice, concurring and dissenting.

I join the majority opinion, as to the determination of guilt. I dissent, however, as to the imposition of the penalty of death. I believe the trial court committed error in permitting the jury to consider the appellant's prior juvenile adjudications of delinquency as an aggravating circumstance during the penalty phase.

Our death penalty statute provides a precise formula for narrowly considering those cases in which the extreme penalty of death should be imposed. *Blystone v. Pennsylvania*, 494 U.S. 299, 306–07, 110 S.Ct. 1078, 1083, 108 L.Ed.2d 255, 264 (1990). As such it constitutes the most severe penal statute in this Commonwealth. This Court is required to interpret penal statutes in the strictest sense, giving any benefit of liberal interpretation to the accused. 1 Pa.C.S. § 1928.

With these principles in mind we turn to the actual words of the provision at issue. 42 Pa.C.S. § 9711(d)(9) sets forth the following aggravating circumstance: "The defendant has a significant history of felony convictions involving the use or threat of violence to the person." In the instant case, the prosecutor was permitted to use this provision to present evidence of an aggravating circumstance to the jury, when the appellant had no history of felony convictions, but only a history of juvenile adjudications of delinquency.

The introduction of these prior adjudications should not have been permitted within the scope of 42 Pa.C.S. § 9711(d)(9). Under our statutes, the terms "felony conviction" and "adjudication of delinquency" are not synonymous. In fact, in the instances when the legislature has dealt with the two terms within one piece of legislation, it has acknowledged the difference to be accorded the two designations. *See,* 42 Pa.C.S. § 2154 *Adoption of guidelines for sentencing;* and 204 Pa.Code § 303.7(g) *Prior Record Score.*

Generally, adjudications are inadmissable in any subsequent court proceeding. A narrow exception to that rule was provided within the Juvenile Act at 42 Pa.C.S. § 6354:

### § 6354. Effect of adjudication

(a) **General rule.**—An order of disposition or other adjudication in a proceeding under this chapter is not a conviction of crime and does not impose any civil disability ordinarily resulting from a conviction or operate to disqualify the child in any civil service application or appointment.

(b) **Effect in subsequent judicial matters.**—The disposition of a child under this chapter may not be used against him in any proceeding in any court other than at a subsequent juvenile hearing, whether before or after reaching majority, except:

(1) in dispositional proceedings after conviction of a felony for the purposes of a presentence investigation and report; or

(2) if relevant, where he has put his reputation or character in issue in a civil matter.

Within the confines of this narrow legislative scheme, a sentencing judge may consider a defendant's prior adjudications. The circumstances under which a juvenile adjudication of delinquency can be referred to for sentencing purposes are set out in the sentencing guidelines at 204 Pa.Code § 303.7:

(b) *Adjudications of delinquency and other prior convictions.*

(1) The offenses scored in this subsection are as follows:

(i) All prior convictions for felonies and all prior convictions for the weapons misdemeanors listed in subsection (a)(3).

(ii) Each prior offense which resulted in a juvenile adjudication of delinquency where:

(A) there was an express finding by the juvenile court that the adjudication was for a felony or one of the weapons misdemeanors listed subsection (a)(3).

(B) the offenses occurred on or after the defendant's 14th birthday, and

(C) the currently sentenced offense is a felony.

No other juvenile adjudication of delinquency shall be counted in the prior record score.

It is obvious from a review of these statutes that the legislature was aware of the difference between juvenile adjudications of delinquency and felony convictions. Otherwise, no valid reason would exist for creating different rules for weighing juvenile adjudications in subsequent criminal proceedings.

Although it can be argued that a death penalty hearing is a sentencing proceeding, and the jury should be informed of all relevant information regarding the defendant, the legislature in drafting our death penalty statute has chosen otherwise.

Jurors in death cases are only given specific limited information, and they are cautioned to consider that information within strict guidelines. Their function may have an impact similar to that of a sentencing judge, but it is accomplished within narrow confines, and without the benefit of broad "judicial" discretion. The legislature chose to limit the jury's consideration of aggravating circumstance (d)(9) to felony convictions in the death penalty statute. In strictly construing this statute, as is our duty, we must conclude that they purposely excluded juvenile adjudications from the consideration of the jury in death penalty cases.

Without a clear direction by the legislature on this serious question, this Court cannot presume to create an aggravating circumstance not contemplated by the authors of the death penalty statute. We must remember "when the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa.C.S. § 1921(b). Therefore, I am compelled to conclude that juvenile adjudications of delinquency, regardless of the nature of the underlying criminal offense, are not to be considered by a jury in deliberation upon a penalty of death. Thus, I would vacate the sentence of death and remand for a new sentencing hearing.

ZAPPALA, J., joins in this concurring and dissenting opinion.