489 A.2d 1340

**COMMONWEALTH of Pennsylvania, Appellant,**

v.

**Richard SYRE, Appellee.**

Supreme Court of Pennsylvania.

Argued Oct. 25, 1984.

Decided April 3, 1985.

Eric B. Henson, Deputy Dist. Atty., Philadelphia, for appellant.

F. Emmett Fitzpatrick, Philadelphia, for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDER-MOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

## OPINION OF THE COURT

FLAHERTY, Justice.

In a trial by jury in the Court of Common Pleas of Philadelphia County, the appellee, Richard Syre, was convicted of the felony of witness tampering. A judgment of sentence of two years probation was imposed. On appeal to the Superior Court, the conviction was reversed, and appellee was discharged. *Commonwealth v. Syre,* 322 Pa.Super. 416, 469 A.2d 1059 (1983). The instant appeal ensued. The sole issue presented is whether the evidence adduced by the Commonwealth was sufficient to sustain the conviction. The witness tampering charges arose in the context of the following factual background.

In June of 1980, Teamsters Local 115 was engaged in a campaign to organize workers at the Penn Radio Cab Com-

pany in Philadelphia. The workers at the Penn Radio Cab Company went out on strike, at the instigation of the Teamsters, and set up a picket line. One of the workers, Ezekiel Gibbs, who was employed as a cab driver, became disenchanted with the Teamsters' efforts and decided that his interests would best be served by not joining a union. Thus, on June 27, 1980, Gibbs crossed the picket line and drove his cab away to commence working again. He was then allegedly pursued and assaulted by five union members, and, in the course of the altercation, Gibbs suffered injuries to his teeth. Gibbs filed a criminal complaint against the union members alleged to have been involved in the assault.

Subsequently, Gibbs met with a business agent of Local 115 to discuss the incident. Gibbs had decided to withdraw the criminal charges, in the interest of laying to rest his difficulties with fellow employees, and he made this fact known to the agent at the start of the meeting. Gibbs sought compensation for the injuries he sustained in the assault, and a settlement in the amount of $1,600 was agreed upon. According to Gibbs' testimony, this sum was to be paid in exchange for a release of the union from civil liability, as well as for withdrawal of the criminal charges. The union's business agent testified, however, that the payment was to be for a release of the civil liability alone. In any event, no portion of the $1,600 settlement was paid to Gibbs at that time.

In the ensuing weeks, Gibbs became impatient with the union's failure to deliver the $1,600. Hence, on several occasions during August and September of 1980, Gibbs met with appellee, the union's legal counsel, to inquire as to the reasons that the settlement funds had not been paid. During that time, appellee also represented one or more of the union members against whom criminal charges had been filed. At these meetings, appellee made certain statements to Gibbs that were used by the prosecution as a basis for bringing charges of witness tampering.

It is of interest to note that the union members involved in the alleged assault were eventually brought to trial. Gibbs testified in the instant proceeding that he never withdrew the charges, despite his earlier expressed intent to do so, because he was being harassed and threatened by co-workers at the cab company, and because the union had not been prompt in delivering all of the settlement money that had been promised. It was the contention of appellee, however, that Gibbs' decision not to drop the charges was the result of pressures exerted by Philadelphia District Attorney Edward Rendell, and former Philadelphia prosecutor Richard Sprague, who allegedly conspired to wage a politically motivated vendetta against John Morris, an influential labor boss in the Philadelphia area, who was a leader of Teamsters Local 115. Indeed, at trial, appellee testified that he regarded Richard Sprague as a predatory person who framed labor boss Tony Boyle in connection with the prosecution of Boyle for the murders of the Yablonski family, a family headed by a competing labor leader. Richard Sprague's law firm served as legal counsel to the Penn Radio Cab Company during its labor dispute with Local 115. Allegations of a conspiracy between Richard Sprague and Edward Rendell appeared in appellee's testimony at trial, as well as in transcripts of certain recorded conversations between Gibbs and appellee which are discussed infra. In short, it is appellee's view that prosecution of the union members for the alleged assault upon Gibbs was an attempt to bring pressures to bear upon John Morris. Whether appellee, through his representation of the union, became a casualty of a power play between union and prosecutorial officials is not, however, within the scope of our inquiry. Irrespective of the motivations underlying the incidents which led to appellee having contact with the witness Gibbs, appellee is accountable under the law for his conduct in interacting with Gibbs, and the sole issue raised in this appeal is the sufficiency of the evidence to sustain appellee's conviction for witness tampering.

It is well established that the test of sufficiency of the evidence is whether, viewing the evidence in the light most favorable to the Commonwealth as verdict winner and drawing all proper inferences favorable to the Commonwealth, the trier of fact could reasonably have determined all elements of the crime to have been established beyond a reasonable doubt. *Commonwealth v. Keblitis*, 500 Pa. 321, 323, 456 A.2d 149, 150 (1983); *Commonwealth v. Kennedy*, 499 Pa. 389, 392, 453 A.2d 927, 928 (1982). The evidence adduced at trial established the following.

On August 21, 1980, appellee delivered to Gibbs the sum of $400, as partial payment of the $1600 owed under the settlement, described supra., that had been agreed upon by Gibbs and the union's business agent. In exchange for the $400, Gibbs signed an agreement in principle to release the union from civil liability. Gibbs testified that appellee stated, at the time of delivering the $400, that the remaining $1200 of the settlement funds would not be paid until the criminal charges had actually been dropped. Appellee testified that, on the day in question, he had no discussion with Gibbs regarding the dropping of criminal charges. Indeed, as to the Bill of Information charging appellee with tampering with a witness on August 21, 1980, appellee was acquitted. Appellee was found guilty, however, upon a Bill of Information charging him with tampering with a witness on September 22, 1980.

Subsequent to his August 21, 1980 meeting with appellee, Gibbs decided, upon motivations heretofore discussed, not to withdraw the criminal charges. He did not inform appellee of this decision. On September 22, 1980, Gibbs met with members of the district attorney's office, and consented to wear a hidden recording device to record his future conversations with appellee. Later that day, Gibbs met with appellee on two occasions, and the tape recordings of those meetings form the heart of the case against appellee. We have reviewed the transcripts of the recorded conversations, and find them to be replete with instances from which the jury could have concluded that appellee employed an offer

of pecuniary benefit in an effort to exert unlawful influences upon Gibbs. In short, the conversations reveal that Gibbs was to be paid the sum of $1600, *ostensibly* for a release of civil liability, but with the threat that the full amount of the funds would not be paid until Gibbs had "cooperated" by doing whatever was necessary to obtain dismissal of the criminal charges. The "cooperation" required of Gibbs consisted of changing his testimony, to indicate that his earlier accounts of the assault had been exaggerated or that his memory of the assault had failed. In addition, there was a discussion of the possibility of Gibbs ignoring a subpoena in order to elude having to testify at trial.

An especially odious aspect of this case is that the taped conversations that were secured by Gibbs were obtained as a result of Gibbs making certain statements to appellee which were lies, and these lies produced further conversation from appellee. Gibbs testified that the deceptions were of his own invention, and that the lies were not suggested by the district attorney's office. Thus, in the tape recorded conversations, Gibbs told appellee that Gibbs was in urgent need of the settlement funds to repay money owed to a threatening individual known as "the man." Gibbs also told appellee that he had spoken with prosecutorial officials to ask them to withdraw the criminal charges, and that those officials threatened to prosecute Gibbs for perjury if he contradicted his previous statements regarding the assault. In addition, he told appellee that prosecutorial officials threatened to subpoena him to testify at the criminal trial. None of the foregoing statements to appellee were true. Notwithstanding the distasteful manner in which the taped conversations were obtained, the transcripts of the conversations do reveal an ample basis upon which the jury could have concluded that appellee employed an offer of pecuniary benefit to induce Gibbs to "testify or inform falsely," 18 Pa.C.S.A. § 4907(a)(1), "withhold ... testimony," 18 Pa.C. S.A. § 4907(a)(2), "elude legal process summoning him to testify," 18 Pa.C.S.A. § 4907(a)(3), or "absent himself" from

a summoned appearance at a criminal trial, 18 Pa.C.S.A. § 4907(a)(4).[1]

The first of the two tape recorded conversations took place at City Hall, on September 22, 1980, when Gibbs attempted to collect the remaining $1200 of settlement funds owed him. That conversation proceeded as follows.

Appellee informed Gibbs that the trial in the criminal assault case was scheduled to commence on December 15, that the district attorney refused to drop the charges, and that the funds due Gibbs for settlement of his civil action would not be delivered, in full, until the criminal case was dismissed. Gibbs was then instructed that he would have to speak with Assistant District Attorney Charles Klein to obtain dismissal of the charges. Gibbs demanded that, if he were to speak to Klein, appellee would have to pay more money, and Gibbs expressed an urgent need for funds to repay a debt owed to a threatening individual known as "the man."

Appellee then lapsed into a diatribe concerning former assistant district attorney Richard Sprague, stating that the prosecution was influenced by Sprague to "throw the book" at the union members who assaulted Gibbs, and noting that Sprague represented Penn Radio Cab Company in the labor dispute from which the assault upon Gibbs arose. In short, appellee portrayed himself and Gibbs as "little guys"

---

**1.** The elements of the offense of witness tampering applicable to appellee's prosecution were set forth in 18 Pa.C.S.A. § 4907, which provided as follows:

(a) Offense defined.—A person commits an offense if, believing that an official proceeding or investigation is pending or about to be instituted, he attempts to induce or otherwise cause a witness or informant to:

(1) testify or inform falsely;

(2) withhold any testimony, information, document or thing except on advice of counsel;

(3) elude legal process summoning him to testify or supply evidence; or

(4) absent himself from any proceeding or investigation to which he has been legally summoned.

(b) Grading.—The offense is a felony of the third degree; if the actor employs force, deception, threat or offer of pecuniary benefit. Otherwise it is a misdemeanor of the second degree.

caught up in a prosecution that was brought at the behest of Sprague, whom appellee regarded as a very powerful individual in Philadelphia.

Gibbs then accused appellee of breaching their agreement as to the time for payment of the civil action settlement funds. Appellee replied that he had never promised to deliver the funds by that date, and that he had only hoped to do so. Appellee informed Gibbs that the assistant district attorney had declared that the criminal case would proceed regardless of whether Gibbs requested otherwise, and that this presented an obstacle to paying for the civil settlement. Gibbs was then warned that if he proceeded with the criminal trial on December 15 there would be no point in appellee and Gibbs engaging in any further conversations. Appellee offered to perhaps "sweeten the deal" by paying more than had been agreed upon as the "civil settlement," but conditioned any additional payments upon Gibbs taking certain steps to secure dismissal of the charges.

The measures which Gibbs would be required to take were expressly set forth by appellee, and they consisted of the following. Gibbs would have to speak with Charles Klein and tell him that he, Gibbs, of his own free will, had decided to drop the charges. Appellee cautioned Gibbs that Klein would inquire as to whether Gibbs had been threatened, or offered money, as an inducement for withdrawing the charges, and Gibbs was further warned that, if trouble from the prosecutor were to be avoided, Gibbs would have to deny any such inducements. To explain his motives for withdrawing the charges, Gibbs was instructed to say that there had been a misunderstanding, that Gibbs wanted to retain his friendships with co-workers who were defendants in the criminal action, that reports of the assault had been greatly exaggerated, that Gibbs' injuries were not very serious, that Gibbs had not anticipated that the prosecution would pursue charges other than simple assault, such as theft and conspiracy, and, finally, that Gibbs did not want to discuss the matter any further with prosecutorial officials.

Appellee told Gibbs that, after meeting with Charles Klein, Gibbs would have to go to the office of the district attorney and speak with Edward Rendell. Appellee explained that Gibbs would have to do a lot of "tap dancing" in his conversations with Klein and Rendell. Gibbs was apprised that, even after speaking with Klein and Rendell, he would not receive the full balance of the promised funds until the criminal charges were in fact dismissed. In the event charges were not dismissed, and trial commenced as scheduled on December 15, Gibbs was told that he would have to do "whatever was required" to assist in terminating the criminal action if he were to secure full payment for settlement of his civil claim. Appellee stated that he could deliver, later that day, an additional portion of the promised settlement funds, if Gibbs would first speak with Charles Klein and report to appellee regarding that conversation. Gibbs stated that he would accept that arrangement, and, after Gibbs was repeatedly directed to deny having had this conversation with appellee, appellee demanded that Gibbs promise to follow through with the actions they had discussed.

After the foregoing discussion at City Hall concluded, Gibbs met with appellee again later that same day at a Burger King restaurant. At this meeting, Gibbs was again wearing a hidden recording device. The conversation at the restaurant proceeded as follows.

Gibbs reported that he had conferred, as requested, with Klein and Rendell, and that they were pressuring him by threatening to subpoena him to testify at the December 15 trial. He further reported that he had been threatened with the possibility of being prosecuted for perjury. This news evoked another discourse from appellee regarding the perceived evils of Richard Sprague. Appellee then delivered to Gibbs an additional portion of the settlement funds, to wit $400, this sum having been promised to Gibbs earlier that day in exchange for Gibbs' talking with Charles Klein. Delivery of this sum reduced to $800 the balance of settlement funds still owed to Gibbs. Appellee reiterated that

Gibbs "must cooperate" with him if the criminal cases go to trial, with the additional admonition that they were "playing with the big guys." Appellee told Gibbs that the district attorney would continue to try to pressure him, but that the district attorney could not force Gibbs to do anything. The political motivations of the district attorney, and of Richard Sprague, were cited by appellee as the reasons for Gibbs being pressured to proceed with the criminal action, and appellee expressed his opinion that Sprague and the district attorney were engaged in a scheme to create pressures upon John Morris, a labor boss in the Philadelphia area.

Appellee advised Gibbs as to how to avoid being forced by the district attorney to testify in the criminal trial. Specifically, appellee explained that Gibbs would be subject to prosecution for perjury if, when called as a witness at trial, Gibbs testified contrary to a signed statement given under oath. To avoid such a prosecution, Gibbs was instructed to testify falsely that his memory had failed, and to testify falsely that he had instigated the affray with the union members by calling one of them a name. Appellee told Gibbs to testify that he had not previously mentioned this latter act of provocation because he was too emotional to remember it at the time of issuing his statement under oath.

Gibbs was then informed that he would have to talk to the district attorney again, and appellee suggested that if the district attorney chose to subpoena Gibbs to testify at trial, Gibbs could ignore the subpoena. Appellee stated that only if Gibbs could be located by the sheriff and transported into the courtroom would it be necessary for Gibbs to testify. Appellee reiterated that Gibbs' testimony should be that the entire incident had become grossly exaggerated, and that Gibbs could safely claim that his recollection of the incident had failed. For instance, despite Gibbs' repeated statements to appellee that his recollection of the incident was clear, and in spite of Gibbs' assertions that he knew and could clearly identify the five union members who assaulted him, appellee persisted in telling Gibbs that

Gibbs' memory had failed. Appellee then asked Gibbs to tell the district attorney that, at the time of identifying the persons who committed the assault, Gibbs had been under pressure which caused him to make identifications of which he was not certain.

As this conversation proceeded, appellee directed that if Gibbs were ever asked about the reasons for money having been delivered to Gibbs by appellee, Gibbs should respond that the money was for settlement of the civil action, and appellee commented that much of their arrangement would have to rest upon trust in one another. Appellee explained that the remaining $800 in settlement funds would be paid whenever the criminal case was over, provided that Gibbs demonstrated the cooperation that was required of him. Gibbs then reminded appellee that earlier that day appellee had agreed to "sweeten the pot a little," whereupon appellee again promised to secure some extra money for Gibbs. Appellee warned Gibbs, however, not to "push his luck," because Gibbs was dealing with some "very dangerous" people, people who "play with knuckles" and who play "hard ball.", and appellee characterized himself as one of those "honorable" but "rough" people. Appellee concluded the conversation by saying that Gibbs was "playing it fairly well," and after again stressing the need for Gibbs to cooperate in order to receive the promised funds, appellee once again stated his view that the district attorney was acting under political motivations in prosecuting the union members.

Subsequent to these conversations with appellee, Gibbs, on October 29, 1980, signed a final release agreement, superseding the agreement in principle to release claims of civil liability that had been executed circa August 21, 1980, the latter date being that on which appellee delivered to Gibbs the first $400 installment of the settlement amount. The final release contained language stating that it was applicable to civil liability alone, and further stating that no obligation was thereby created for Gibbs to refrain from prosecution of any criminal actions. In reversing appellee's

conviction, Superior Court placed much emphasis upon this language in the final release, regarding it as clear evidence that no effort had been made to unlawfully influence Gibbs. We believe Superior Court disregarded the clear import of the conversations heretofore described, and that, in view of the contents of those recorded conversations, the jury no doubt regarded the language in the final release as a subterfuge designed to conceal the witness tampering that the jury found to have occurred on an earlier date, September 22, 1980. Indeed, the tape recorded meetings contained numerous instances of conversation between appellee and Gibbs from which the jury could have concluded that appellee unlawfully influenced Gibbs.

Thus, we reverse the order of the Superior Court, reinstate the judgment of sentence, and remand this case to Superior Court for disposition of appellee's remaining appellate claims.

Order reversed, judgment of sentence reinstated, and case remanded.

ZAPPALA, J., files a dissenting opinion which LARSEN, J., joins.

ZAPPALA, Justice, dissenting.

I must disagree with the majority's conclusion that the evidence presented in Appellee's criminal prosecution rose to a level sufficient as a matter of law to prove the information filed.

From a review of the record, I find, as did the Superior Court, that Appellee dealt with Gibbs with the sole intent of settling the possible civil and criminal effects arising out of an assault on Gibbs. It is important to note that this is not a question of an individual attempting to contact or influence a witness to a prosecution, but rather one of an attorney for one of the parties negotiating with the sole victim of an assault for restitution after the victim had expressed a desire to settle. The mere act of an attorney for a criminal defendant negotiating a complete settlement

with the sole victim of the defendant's conduct which subjects said defendant to both civil and criminal liability is not violative of either the letter or the spirit of the witness tampering prohibition. Indeed, this practice is frequently utilized with approval by courts throughout the Commonwealth as a means of expediting the criminal system.

Appellant was convicted of witness tampering under then-in-effect 18 Pa.C.S.A. § 4907. That section provided as follows:

(a) Offense defined.—A person commits an offense if *believing that an official proceeding or investigation is pending or about to be instituted, he attempts to induce or otherwise cause a witness or informant to:*

(1) testify or inform falsely;

(2) withhold any testimony, information, document or thing except on advice of counsel;

(3) elude legal process summoning him to testify or supply evidence; or

(4) absent himself from any proceeding or investigation to which he has been legally summoned.

(b) Grading.—The offense is a felony of the third degree *if the actor employs force, deception, threat or offer of pecuniary benefit.* Otherwise it is a misdemeanor of the second degree. (emphasis added)

Clearly, from the italicized portions of the statute above, section 4907(a) requires a particular mens rea, namely, that the actor possessed the subjective belief that an official proceeding was pending or about to be instituted and that the actor specifically intended by his conduct to induce or cause a witness or informant to take any of the unlawful actions enumerated in subsections (1)–(4). Moreover, to rise to the felony level, the actor must employ force, deception, threat or the offer of pecuniary benefit in the attempt to achieve said specific intent. In the absence of the rare direct expression of an actor's subjective intent and state of mind, the mens rea must necessarily be proven by circumstantial evidence and inferences arising from the actor's words and deeds.

As this Court has stated many times, the test for reviewing the sufficiency of the evidence is:

> [W]hether accepting as true all the evidence and all reasonable inferences deductible from such evidence, upon which the trier of fact could have based its verdict, the evidence and inferences are sufficient in law to prove guilt beyond a reasonable doubt. (citations omitted). Moreover, in reviewing the evidence, we must consider it in the light most favorable to the verdict winner. (citations omitted).

*Commonwealth v. Scudder*, 490 Pa. 415, 418, 416 A.2d 1003, 1005 (1980). Further, while wholly circumstantial evidence may sustain a criminal conviction if sufficiently strong to support an inference of guilt beyond a reasonable doubt as to each material element of a crime, *id.*, the conviction may not be based upon mere surmise or conjecture. *Commonwealth v. Thomas*, 465 Pa. 442, 446, 350 A.2d 847, 849 (1976); *Commonwealth v. Derr*, 501 Pa. 446, 462 A.2d 208 (1983). As we stated in *Commonwealth v. New*, 354 Pa. 188, 221, 47 A.2d 450, 468 (1946), "[w]hen two equally reasonable and mutually inconsistent inferences can be drawn from the same set of circumstances, a jury must not be permitted to guess which inference it will adopt, especially when one of the two guesses may result in depriving a defendant of his life or his liberty." *See also Commonwealth v. Wojdak*, 502 Pa. 359, 367–70, 466 A.2d 991 (1983) (Opinion announcing the judgment of the Court).

With the foregoing principles in mind, I have reviewed the record and find it inadequate to support appellee's conviction for tampering with a witness; specifically, I find insufficient evidence to demonstrate beyond a reasonable doubt that appellee possessed the requisite mens rea.

As to the charges stemming from the events of August 21, 1980, the evidence against appellee was primarily the trial testimony of Ezekial Gibbs who testified that $1,600 would be paid him by the Teamsters union in exchange for Gibbs dropping the criminal charges against the union members and for settlement of the civil suit. Gibbs' testi-

mony was contradicted by appellee and the union's business agent, and appellee was acquitted on the charges of tampering pertaining to his actions of August 21, 1980.

As to the charges stemming from the events of September 22, 1980, for which appellee was found guilty, the evidence against appellee consisted of the tape recorded conversations between appellee and Gibbs. The transcript of substantial portions of those conversations are set forth in the majority opinion, obviating my need to do so in this opinion. However, I cannot read those conversations or any other record evidence as supporting a criminal intent on appellee's part—not even by a preponderance of the evidence and certainly not beyond a reasonable doubt.

From the beginning when Gibbs discussed the matter with the Teamsters' business agent, Gibbs expressed *his* intention to drop the criminal charges against the union members. The business agent relayed this information to appellee and Gibbs confirmed his stated intention to drop the criminal charges in *all* of his discussions with appellee. Gibbs admitted at trial that he never informed either appellee or any union official that he had changed his mind and decided to pursue the prosecution of the union members. Accordingly, it is uncontradicted that at all times appellee acted on the belief that Gibbs did not intend or desire to press the criminal charges.

Appellee made several unequivocal statements to Gibbs on September 22nd that the money to be paid him by the union was strictly for settlement of Gibbs' civil claims against the union and its members, "no matter what happen[ed]" with the criminal charges.[1] That is, the money for the settlement of the civil claims would be paid whether or not the union members were criminally prosecuted. *See* note 2, *supra*. These unequivocal statements were buttressed by the language of the final release executed by Gibbs which states: "This Release does not apply to any criminal proceedings nor does it place me under any obli-

---

1. *See, e.g.* Brief for Appellant, Appendix D at 2, 8, 13; Appendix E at 10.

gation whatsoever to refrain from the prosecution of any criminal actions...." Appellee also stated several times to Gibbs that the decision whether to prosecute was to be made of his own free will. He further told Gibbs that his clients needed Gibbs' cooperation in the withdrawal of the criminal charges and explained what that cooperation might entail.

Maintaining the posture that he intended to drop the criminal charges, Gibbs began to lie to appellee. Gibbs admitted at trial that he lied to appellee in telling appellee that the District Attorney's office intended to subpoena him (Gibbs) and had threatened to prosecute him if he did not proceed on the criminal charges. Responding to these lies "as an attorney", appellee discussed with Gibbs the possibilities of what might happen to him (Gibbs) in a prosecution for perjury [2] and explained the mechanics of the subpoena process. Appellee advised Gibbs, however, to discuss these matters with independent counsel, and referred Gibbs to another attorney.

Finally, it should be noted that Gibbs did, in fact, receive the agreed-to settlement sum and that the union members were, in fact, prosecuted on the criminal charges stemming from the picket-line incident.

Even if appellee's taped conversations were susceptible of the inference that appellee counselled Gibbs on *how to* change his testimony and *how to* avoid a subpoena, as the majority infers, there is *nothing* in those conversations or elsewhere on the record from which one could infer that *appellee was attempting to induce Gibbs* to alter his testimony or "duck" service. To the contrary, the record

2. From both the taped conversations and appellee's trial testimony, it appears that appellee believed that, when Gibbs suggested the District Attorney's office threatened him (Gibbs) with prosecution, such "prosecution" would be for perjury; that is, for giving prior sworn statements to the police investigators which contradicted his present posture of wishing to drop the case. Accordingly, appellee offered some suggestions as to what Gibbs might say at trial, if a trial was held, that would not place him in jeopardy of perjury charges.

demonstrates that *Gibbs induced appellee*, through misrepresentations, to offer advice on the possibility of perjury and the possibility of ignoring a subpoena. Even though appellee's advice may have been ill-advised, there is no support for the inference that it was rendered with the requisite mens rea or criminal intent. It was Gibbs who made manifest *his intention* to drop the criminal charges against appellee's clients; it was Gibbs who deceptively elicited appellee's advice on Gibbs' possible prosecution for perjury; it was Gibbs who deceptively elicited appellee's advice regarding the subpoena; Gibbs was, consequently, the "inducer," not the "inducee." Even if the contrary inference (that appellee attempted to induce Gibbs to alter his testimony or elude legal process) were equally supported by the record (which it is *not*), a jury must not be permitted to guess or to speculate as to its choice of equally compelling inferences, one lawful and one unlawful, where the quantum of proof required is *proof beyond a reasonable doubt. See, e.g., Commonwealth v. New, supra* and *Commonwealth v. Scudder, supra.* Accordingly, I would hold that the Commonwealth has failed to meet its burden of establishing a material element of the crime of tampering with a witness as it has produced insufficient evidence to demonstrate that appellee attempted to induce or otherwise cause Gibbs to testify falsely, to withhold testimony, to elude legal process or to absent himself from proceedings.

Moreover, even if the requisite criminal intent were present (which it is *not*), the offense in this case could not be graded higher than a misdemeanor of the second degree, for there is no proof that the actor employed force, deception, threat or offer of pecuniary benefit. 18 Pa.C.S.A. § 4907(b). The only suggestion of an offer of pecuniary benefit is the $1600 (and a *possibility* of coming up with a bit more) for the settlement of Gibbs' civil claims. However, the unequivocal tape recorded conversations and the language of the final release prove that appellee made it quite clear that Gibbs would receive that amount for settle-

ment regardless of whether he withdrew the criminal charges, even though the union and appellee expected and desired Gibbs' cooperation on those charges. Payment was actually made despite the prosecution to trial of those charges. The record does not support, therefore, a finding that the appellee's conduct was accompanied by an offer of pecuniary benefits in exchange for Gibbs' performing all or some of the actions enumerated in 18 Pa.C.S.A. § 4907(a)(1–4).

Because the judiciary must take care to ensure that law enforcement officers do not cross the line between active investigation and zealous advocacy of the public's interests, on the one hand, and active participation in the manufacture of crimes, on the other, my careful review of the entire record compells me to note my dismay at the questionable tactics employed in the instant case. As set out before, the record clearly indicates that it was Gibbs' sole intention and desire to drop the criminal charges against the four defendants. He communicated this desire to Joe Yeoman of the Teamsters Union. It was only after Gibbs had contacted the District Attorney's Office and agreed to be wired with a tape recorder that the testimony indicates Gibbs' "change of heart." The transcripts of those covert recordings viewed in the light of the earlier happenings reveal the attempt by Gibbs through various fabrications to lead the Appellee into making statements that would incriminate him in a scheme to influence Gibbs' decision to prosecute. Gibbs several times admits that statements he made to Syre were complete fabrications. I must therefore emphasize to all prosecutors that the function of the prosecutor's office is not to merely seek convictions, but rather to seek justice.

For the foregoing reasons, I would affirm the Superior Court's order reversing Appellee's conviction and discharge him.

LARSEN, J., joins in this dissenting opinion.